## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2020, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander L. Hoover
Law Office of Christopher G. Walter, P.C.
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Steven J. Hosler
David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of D.F., Father, K.P., Mother, and W.F., Minor Child,

K.P.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

January 31, 2020

Court of Appeals Case No. 19A-JT-1802

Appeal from the
Starke Circuit Court

The Honorable
Kim Hall, Judge

Trial Court Cause No.
75C01-1812-JT-24

**Kirsch, Judge.**

[1] K.P. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor child, W.F. ("Child"). Mother raises the following restated issue on appeal: whether the juvenile court's judgment terminating her parental rights was supported by clear and convincing evidence.

[2] We affirm.

## Facts and Procedural History

[3] Mother and D.F. ("Father")[1] are the biological parents of Child, who was born on February 9, 2016. On September 4, 2017, a report was received on the Indiana Department of Child Services ("DCS") hotline regarding Child. Mother and Father were arrested after a traffic stop that was initiated due to a report of domestic violence between Mother and Father while in the car. *Tr. Vol. 2* at 8; *CASA Ex.* 1 at 95. During the traffic stop, the police found illegal drugs in the car. *DCS Ex.* 3 at 9. Mother was charged with Level 6 felony possession of methamphetamine and Class A misdemeanor possession of a controlled substance, and Father was charged with Level 6 felony domestic battery. *Tr. Vol. 2* at 12-13. Child was present in the car during the alleged domestic violence incident and traffic stop, and because the arrests of Mother

---

[1] Father's parental rights were also terminated on July 11, 2019 in the same order that terminated Mother's parental rights. However, Father does not join in this appeal. We will, therefore, confine the facts to only those pertinent to Mother's appeal.

and Father left Child without a caregiver, Child was removed from their care and placed in foster care. *Id*. at 8, 10. The DCS family case manager ("FCM") that removed Child asked Mother if she would be willing to submit to a drug screen, and Mother declined. *Id*. at 9. Mother informed the FCM that she had recently been in drug treatment but had relapsed approximately three days before. *DCS Ex*. 3 at 10.

[4] On September 5, 2017, DCS filed a petition alleging that Child was a child in need of services ("CHINS"), and on October 3, 2017, Child was adjudicated to be a CHINS when Mother and Father admitted the allegations. In a dispositional decree on October 31, 2017, the juvenile court ordered Mother and Father to complete substance abuse treatment or other programs recommended by DCS, submit to random drug screens, and complete any domestic violence assessments or programs recommended by DCS. *DCS Ex*. 4 at 13-14. Child was placed in the care of a paternal cousin, and all visitation with Child by Mother and Father was to be in a supervised setting. *Id*. at 14. FCM Caitlyn Young ("FCM Young") was assigned to the case.

[5] After her arrest, Mother was released on pretrial supervision through the Starke County Probation Department and ordered to begin drug treatment. *Tr. Vol. 2* at 19. Mother initially complied with the reunification services ordered by the juvenile court and began home-based services and visitations at the end of October 2017. *Id*. at 24. However, DCS was unable to locate Mother from about November 2, 2017 to December 7, 2017, and it was eventually discovered that she had been arrested for a violation of her pretrial release and was in the

Starke County Jail. *Id*. at 25. On November 22, 2017, Mother's bond was revoked and a warrant for her arrest was issued after she failed to attend scheduled appointments with a probation officer. *DCS Ex*. 13; *Tr. Vol. 2* at 27. Mother also failed to notify the court or her probation officer that she was not residing at the address provided at intake and failed to attend six scheduled drug treatment classes. *DCS Ex*. 13; *Tr. Vol. 2* at 27. On November 30, 2017, Mother was arrested on the warrant, and she tested positive for methamphetamine and was found to be carrying a bottle of alcohol at the time of her arrest. *DCS Ex*. 16.

[6] Shortly after December 7, when DCS had located Mother, FCM Young went to the jail and offered Mother a drug screen, and Mother refused, stating that she wanted "to wait to do a drug screen until it would be clear." *Tr. Vol. 2* at 25. Mother was released from jail on January 17, 2018 after she pleaded guilty to possession of methamphetamine from her September 4, 2017 arrest and was sentenced to thirteen months on probation. *Id*. at 25-26, 28. After her release from jail, Mother contacted FCM Young and informed her that Mother wished to begin her random drug screens, have visitations start, and reinstate services. *Id*. at 29. In January 2018, Mother began substance abuse treatment at Keys Counseling, and she completed a substance abuse assessment and was recommended for individual and group classes. *Id*.

[7] At a review hearing about a month later, it was found that Mother was participating in services and visitations with Child. *DCS Ex*. 5. On April 20, 2018, Mother called FCM Young from the Economy Inn where she was staying

with Father and reported that Father was intoxicated and had become belligerent. *Tr. Vol. 2* at 32. He had thrown his keys at Mother, making Mother upset. *Id.* The hotel staff had called the police, and Father was arrested; Mother then became upset because she did not want Father to be arrested. *Id.* at 33.

[8] At a review hearing held on May 1, 2018, Mother was still complying with services, and the juvenile court approved DCS's request that Mother have partially supervised visits with Child as long as she maintained her sobriety, participated in services, and worked on obtaining stable housing. *Id.* at 35; *DCS Ex.* 6 at 20. At that time, Mother and Father were still together, but had moved from the Economy Inn in Starke County to the Red Rock Inn in Plymouth, Indiana. *Tr. Vol. 2* at 35-36. Mother and Father failed to show up to a meeting with DCS on June 29, 2018, to discuss future visitation plans. *Id.* at 36. FCM Young tried to contact them several times and did not receive a response. *Id.* She then went to the Red Rock Inn to check on Mother and Father and to administer a drug screen. *Id.* Mother tested negative, but Father refused to be screened. *Id.* at 37. Mother was upset with Father for refusing to be screened and left him at the Red Rock Inn, moving across the street to a different motel. *Id.* Father ceased participating in any services after June 29, 2018. *Id.*

[9] After this failure to show up for the meeting, Mother's compliance with services was off and on, and she cancelled a couple of visits with Child and appointments with her service providers because she was "trying to get on her feet" and "figure out what life would be like . . . as a single parent." *Id.* at 45.

Throughout July 2018, Mother communicated with FCM Young, but was not "super compliant in her services." *Id.* at 46. In August, she moved to Pierceton, Indiana to live with a family friend, and she requested that her services be moved to that area. *Id.* At that time, Mother was employed in Plymouth, but she later left that employment to search for a job closer to where she was living in Pierceton. *Id.* at 46-47.

[10] At a permanency hearing held on August 21, 2018, Mother was still compliant with services and showing progress. *Id.* at 47. A permanency plan for reunification and a concurrent plan of guardianship was put into place at that time. *Id.* However, between August 2018 and December 2018, Mother's progress began to falter. During that time, Mother had multiple interviews for new jobs set up, but she either failed to show up for the interviews or failed to follow the instructions of the hiring company and was not hired. *Id.* at 48. She also cancelled or failed to appear at several appointments with her service provider and several visitations with Child. *Id.* Mother had anger management issues, and during this time frame, it became worse. *Id.* at 49. Mother would become angry and "would call and cuss out [the] service providers or cuss them out in person" when they were late to drive Mother to visitations by as little as five to ten minutes. *Id.* When Mother made demands for time and schedule changes that FCM Young or service providers could not accommodate, Mother "would yell and scream and . . . use curse words towards [FCM Young], until [FCM Young] had to end the phone call." *Id.* Although ordered to do so, Mother failed to complete any services for anger management. *Id.* at 159-60.

[11]     Mother also became angry in front of Child, specifically when Child called the foster placement "Mom." *Id*. at 50. Mother yelled and screamed at Child that the foster parent was not her mother. *Id*. Mother would also raise her voice if she became agitated during visitation. *Id*. Child had been diagnosed with PTSD with dissociative symptoms, and her triggers are loud sounds. *Id*. at 98-99, 101. Child responded poorly to raised voices "because she is a child of a domestic violence relationship, and she really struggles with raised voices." *Id*. at 50.

[12]     After Father stopped participating in services, there was a change in Child's behavior during visits between Mother and Child. *Id*. at 51. Child began to show more aggression, and on one occasion, Child tried to throw a television remote at Mother. *Id*. FCM Young stated that Child was less engaged in visits with Mother, and Child was happy when Mother cancelled visits. *Id*. Child also started correcting FCM Young when she called Mother "mom"; Child corrected FCM Young's statement by calling Mother by her first name. *Id*. at 51-52. During visitations, Mother also had difficulty in providing nutritious meals for Child although she had been provided educational tools on nutrition for Child. *Id*. at 85. The service provider opined that in the beginning, Mother lacked knowledge, but after being provided the tools and education, the service provider saw "the follow through for a while, but [Mother] just doesn't maintain." *Id*.

[13]     In December 2018, Mother was no longer living with her family friend in Pierceton, and she refused to provide DCS with her address, telling FCM

Young that it "was none of [her] business." *Id*. at 52. At that time, Mother relapsed and tested positive for methamphetamine, oxycodone, and THC. *Id*. FCM Young set up a meeting with Mother in early December to try to get her back on track with services, and when Mother came to the office, she was visibly impaired. *Id*. at 53. FCM Young did a drug screen, and Mother "could barely write her name on the drug screen"; she tested positive for oxycodone. *Id*. at 53. After that positive screen, Mother tested positive for both methamphetamine and THC. *Id*. On December 11, 2018, a review hearing was held at which the juvenile court found that Mother had ceased to comply with DCS and had relapsed. *DCS Ex*. 8 at 25. The juvenile court also found that Mother was inconsistent with home-based casework, visitation, and she lacked stable housing and had failed to maintain consistent communication with DCS, CASA, and service providers. *Id*. At that time, DCS stopped providing services to Mother, and the permanency plan was changed to termination of parental rights and adoption. *Id*.

[14] On December 18, 2018, DCS filed its petition to terminate Mother's parental rights to Child. *Appellant's App. Vol. II* at 9-11. On May 29, 2019, the juvenile court held the factfinding hearing on DCS's termination petition. At the hearing, evidence was presented regarding Mother's struggles with substance abuse, and her multiple relapses. Mother had completed three drug treatment programs and relapsed after two during the CHINS case. *Tr. Vol. 2* at 54. At the time of the hearing, Mother had voluntarily entered into another drug

treatment program, which she completed on May 28 and was scheduled to begin relapse prevention services. *Id*. at 113-14.

[15] Testimony was given by one of Mother's service providers who provided case management services involving parenting, domestic violence, substance abuse, and behavioral techniques to cope with anger. *Id*. at 72-73. The service provider worked with Mother on her behavior and coping skills, and although Mother was receptive to learning the skills, often "there was no follow through" with the techniques shown. *Id*. at 77. The service provider summed up the progress she made with Mother as, "I saw a little progress. But by the end of the services, it was still pretty much the same." *Id*. at 78.

[16] Evidence was also presented that Mother was not able to obtain stable housing or employment throughout the proceedings even with help from the service providers. *Id*. at 74-75. When she was with Father, they lived in several different motels, and Mother lived with her grandmother occasionally and with her family friend for a period of time. *Id*. at 75. After she moved out of the family friend's home, Mother would not provide an address to DCS, but on March 19, 2019, she had moved into her grandfather's home and still resided there at the time of the hearing. *Id*. at 52, 108. When services first began, Mother had no employment, and over the course of the proceedings, she worked two or three factory jobs and cleaned houses but was unable to maintain steady employment. *Id*. at 75-76. At the time of the hearing, Mother was not employed and had not been employed since August 2018. *Id*. at 142.

[17] On the date that the hearing was held, Child had been removed from Mother's care for twenty months and was placed in a stable home. *Id*. at 55-56. FCM Young testified that Child required a stable home that provides for her needs and that Child was bonded to the foster placement and the other children in the home. *Id*. at 56. The plan for Child's care was adoption by the current placement family, Father's first cousins. *Id*. FCM Young testified that termination of Mother's parental rights and adoption was in Child's best interest because "Mother . . . had not shown that [she was] able to meet the needs of the child. [She hasn't] shown stability or sobriety. [Mother] hasn't communicated with DCS about stability in her income, stability in her housing. She hasn't shown improvement in her anger management." *Id*.

[18] Child's court appointed special advocate, Cortny Barnes ("CASA Barnes") filed a court report on May 29, 2019. *CASA Ex*. 1 at 96. CASA Barnes reported that Child "is happy and healthy in relative care. She is growing and developing cognitively as she should. [Child] is an extremely happy little girl that is shy when she first meets people." *Id*. CASA Barnes agreed with DCS and recommended that parental rights of Mother be terminated, and Child remain with her foster placement to be adopted. *Id*.

[19] At the conclusion of the hearing, the juvenile court took the matter under advisement. On July 11, 2019, the juvenile court issued its order and findings

of fact and conclusions thereon terminating Mother's parental rights.[2] Mother now appeals.

## Discussion and Decision

As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive -- so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child and parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until

---

[2] We wish to commend the juvenile court on its thorough findings of fact and conclusions thereon, which greatly aided in our determination of this case.

the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[21] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[22] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

Mother contends that the juvenile court erred when it terminated her parental rights because DCS failed to meet its burden by clear and convincing evidence. Specifically, Mother argues that DCS failed to prove that there was a

reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside of the home would not be remedied because, over the five months since DCS terminated her services, she has completed a drug treatment program and had multiple clean drug screens. Mother also asserts that DCS failed to present clear and convincing evidence that the continuation of the parent-child relationship posed a threat to the well-being of Child because evidence showed that she had combatted her drug issues, had stable housing, had gotten a vehicle, and was in the process of obtaining employment. Mother additionally claims that termination was not in the best interests of Child because the evidence of Mother's progress and the strong presumption that a child should be with her natural parent show that Child's best interests are to be in the care of Mother.

[25] Initially, we note that Mother has not challenged any of the juvenile court's findings of fact as being clearly erroneous. We, therefore, "must accept these findings as true." *In re S.S.*, 120 N.E.3d 605, 610 (Ind. Ct. App. 2019). Because the unchallenged findings stand as proven, all we need do is determine whether the unchallenged findings support the judgment, and if they do, we must affirm. *Id.* at 611.

### *Remediation of Conditions*

[26] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what

conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *D.B.,* 942 N.E.2d at 873.

[27] Here, the conditions that led to Child's removal from Mother's care were that, on September 5, 2017, Mother and Father were arrested based on allegations of domestic violence and substance abuse by the parents, and these arrests left

Child without a caregiver. Child was adjudicated a CHINS based on the need for a "safe, stable home environment that is free from substance abuse." *DCS Ex.* 4 at 12. At the time of Child's removal, illegal drugs were found in the car, and Mother was charged with Level 6 felony possession of methamphetamine and Class A misdemeanor possession of a controlled substance. *DCS Ex.* 3 at 9; *Tr. Vol. 2* at 12-13. The DCS FCM that removed Child asked Mother if she would be willing to submit to a drug screen. Mother declined, and she informed the FCM that she had recently been in drug treatment but had relapsed approximately three days before. *DCS Ex.* 3 at 10; *Tr. Vol. 2* at 9.

[28] Throughout the proceedings, Mother continued to struggle with substance abuse. Although she had completed a drug treatment program prior to the CHINS case being filed, she relapsed and was arrested for possessing illegal drugs. After her arrest, Mother was released on pretrial supervision and ordered to begin drug treatment. *Tr. Vol. 2* at 19. However, DCS was unable to locate Mother from about November 2, 2017 to December 7, 2017, and it was eventually discovered that she had been arrested for violating her pretrial release, for among other things, testing positive for methamphetamine. *DCS Ex.* 16. Shortly after DCS located Mother in jail, FCM Young went to the jail and offered Mother a drug screen. Mother refused and said that she wanted "to wait to do a drug screen until it would be clear." *Tr. Vol. 2* at 25. In January 2018, Mother began substance abuse treatment and completed a substance abuse assessment and was recommended for individual and group classes. *Id.* at 29. Mother completed her treatment in May 2018 and maintained her

sobriety until December 2018, when she relapsed and tested positive for methamphetamine, oxycodone, and THC. *Id*. at 52. In early December 2018, FCM Young set up a meeting with Mother, and when Mother came to the office, she was visibly impaired and "could barely write her name on the drug screen." *Id*. at 53. She tested positive for oxycodone, and after that positive screen, Mother tested positive for both methamphetamine and THC. *Id*.

[29] Further evidence was presented that, although Mother was compliant with services and visitation with Child for a period of time in the duration of the case, she was not able to remain consistent in her compliance. Although compliant with services for several months in 2018, Mother failed to show up to a meeting with DCS on June 29, 2018, to discuss future visitation plans. *Id*. at 36. After this failure to show up for the meeting, Mother's compliance with services was off and on, and she cancelled visitations with Child and appointments with her service providers because she was trying "figure out what life would be like . . . as a single parent." *Id*. at 45. Throughout July 2018, she was not "super compliant in her services," and in August, after moving to another town, she left her employment to search for a job closer to where she was living and remained unemployed for the duration of the proceedings. *Id*. at 46-47, 142. Between August 2018 and December 2018, Mother's progress continued to falter, and she cancelled or failed to appear at several appointments with her service provider and several visitations with Child. *Id*. at 48.

[30]     Additionally, Mother had anger management issues and would become angry and "would call and cuss out [the] service providers or cuss them out in person" when they were late to drive Mother to visitations by as little as five to ten minutes. *Id*. Although ordered to do so, Mother failed to complete any services for anger management. *Id*. at 159-60. Mother also became angry in front of Child and would also raise her voice if she became agitated during visitation, which was a particular problem because Child had been diagnosed with PTSD with dissociative symptoms, and her triggers are loud sounds. *Id*. at 50, 98-99, 101. Further, during visitations, Mother also had difficulty in providing nutritious meals for Child although she had been provided educational tools on nutrition for Child. *Id*. at 85.

[31]     Evidence was also presented that Mother was not able to obtain stable housing or employment throughout the proceedings even with help from the service providers. *Id*. at 74-75. When she was with Father, they lived in several different motels, and Mother lived with her grandmother occasionally and with her family friend for a period of time, but after she moved out of that home, she would not provide an address to DCS. *Id*. at 52. When services first began, Mother had no employment, and although she had worked two or three factory jobs and cleaned houses, at the time of the hearing Mother was not employed and had not had employment since August 2018. *Id*. at 75-76, 142. Based on the evidence presented, we conclude that the juvenile court's conclusion that Mother would not remedy the conditions that resulted in removal was supported by clear and convincing evidence.

[32] Mother argues that the evidence did not support the conclusion that the conditions that resulted in removal would not be remedied because the juvenile court should have looked at her situation at the time of the termination hearing when she had voluntarily completed drug treatment and was maintaining her sobriety. Although the juvenile court must consider a parent's fitness as of the day of the termination hearing, it is within the discretion of the trial court to "disregard the efforts [a parent] made only shortly before termination and to weigh more heavily [the parent's] history of conduct prior to those efforts." *K.T.K.,* 989 N.E.2d at 1234. The juvenile court concluded that "Mother['s] . . . substance abuse has not been remedied and renders [Mother] unable to safely provide care for the Child." *Appellant's App. Vol. II* at 66. Mother's arguments are a request to reweigh the evidence, which we will not do. *In re H.L.*, 915 N.E.2d at 149. The juvenile court was free to discredit Mother's testimony about her recent completion of a drug treatment program in light of her past failures at maintaining her sobriety, and we do not judge witness credibility. *Id.* The juvenile court's determination that the conditions that resulted in removal would not be remedied was not clearly erroneous.[3]

---

[3] Mother also challenges the juvenile court's conclusion that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being. However, we do not have to address the issue because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

## Best Interests

[33] In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed*. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id*. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id*. (citing *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[34] Looking at the totality of the evidence, it was shown that Child had been removed from Mother's care for over twenty months and had been diagnosed with PTSD with dissociative features. Child's triggers are loud noises, and she was very fearful of loud voices "because she is a child of a domestic violence relationship, and she really struggles with raised voices." *Tr. Vol. 2* at 50. 98-99, 101. Child required a safe, nurturing, consistent, and predictable environment. At the time of the hearing, Child no longer displayed aggression, had reduced

separation anxiety, and was making progress in her communication. *Id*. at 99-100. In order to make further progress, Child needed stability in housing and caregiving, something Mother had been unable to provide, due to her inability to maintain sobriety, provide a stable home free of domestic abuse, or address her anger issues.

[35] A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id*. (citing *McBride v. Monroe Cty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). At the time of the termination hearing, although Child had been removed for close to two years, Mother had failed to make the changes in her life necessary to provide Child with a safe and healthy environment. As discussed above, DCS presented sufficient evidence that there was a reasonable probability that Mother would not remedy the reasons for Child's removal. Additionally, the CASA and FCM Young both testified that they believed termination of Mother's parental rights would be in Child's best interests. *Tr. Vol. 2* at 56; *CASA Ex*. 1 at 96. FCM Young testified that, "Mother . . . had not shown that [she was] able to meet the needs of the child. [She hasn't] shown stability or sobriety. [Mother] hasn't communicated with DCS about stability in her income, stability in her housing. She hasn't shown improvement in her anger management." *Tr. Vol. 2* at 56. Based on the totality of the evidence, we

conclude that the evidence supported the juvenile court's determination that termination of Mother's parental rights was in Child's best interests. Mother's arguments to the contrary are a request for this court to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149.

[36] Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[37] Affirmed.

Bailey, J., and Mathias, J., concur.